Alfred T. GIULIANO, Chapter 7 Trustee of the Ritz Estate; CPM Electronics Inc.; E.S.E. Electronics, Inc.; and Mflash, Inc., on Behalf of Themselves and All Others Similarly Situated, Plaintiffs,

v.

SANDISK CORPORATION, Defendant.

Case No: C 10–2787 SBA

United States District Court, N.D. California, Oakland Division.

Signed 04/29/2016

Colleen Duffy–Smith, Morgan Tidalgo Sukhodrev & Azzolino LLP, San Jose, CA, Jason Scott Hartley, Ryan Dennis O'Dell, Stueve Siegel Hanson LLP, San Diego, CA, Joseph S. Hall, Michael E. Joffre, Kellogg Huber Hansen Todd Evans & Figel, PLLC, Robert Stephen Berry, Berry Law PLLC, William J. Conynham, Kellogg, Huber, Hansen, Todd, Evans & Figel, Washington, DC, Norman E. Siegel, Stueve Siegel Hanson LLP, Kansas City, MO, Steven F. Benz, Washington, DC, for Plaintiffs.

Raoul Dion Kennedy, Ian Chen, James Patrick Schaefer, Skadden Arps Slate Meagher & Flom LLP, Palo Alto, CA, David W. Hansen, Skadden Arps Slate Meagher & Flom LLP, San Francisco, CA, Michael Menitove, Skadden, Arps, Slate, Meagher and Flom, LLP, New York, NY, Patrick Maben Hammon, Palo Alto, CA, for Defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

SAUNDRA BROWN ARMSTRONG, Senior United States District Judge

Plaintiffs, Alfred T. Giuliano, Chapter 7 Trustee to the Ritz Estate; CPM Electronics, Inc. ("CPM"), E.S.E. Electronics, Inc. ("ESE"); and Mflash, Inc. ("Mflash"), bring the instant antitrust class action against SanDisk Corporation ("SanDisk"), pursuant to § 2 of the Sherman Antitrust Act, 15 U.S.C. § 2. They allege that SanDisk fraudulently obtained two patents from the United States Patent and Trademark Office ("PTO") in order to monopolize the market for NAND flash memory. This type of antitrust claim is commonly referred to as a <u>Walker Process</u> claim, named for the Supreme Court's decision in <u>Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.</u>, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965).

The parties are presently before the Court on SanDisk's Renewed Motion for Summary Judgment and Motion to Exclude Opinions and Testimony of Dr. Ryan Sullivan. Dkt. 312, 313. Having read and considered the papers filed in connection with these matters and being fully informed, the Court hereby GRANTS SanDisk's motion for summary judgment. Be-

cause the Court's ruling is not dependent on the opinions of Dr. Sullivan, SanDisk's motion to exclude his opinions and testimony is DENIED as moot.[1]

## I. BACKGROUND

### A. OVERVIEW

NAND flash memory is a type of non-volatile Electronically Erasable Programmable Read Only Memory ("EEprom"). Non-volatile memory chips are comprised of a series or array of memory cells capable of retaining data, even when power is removed from the chip. Each memory cell consists of a source, drain, floating gate and a gate (or control gate). An electrical charge is applied to the control gate, which draws electrons from the source towards the drain. Along the way, some of the electrons are stored in the floating gate, where bits of data are ultimately "programmed" or stored. The electrical charge ceases once the memory cell has reached its desired programming state. To erase data, a positive charge is applied, which causes the floating gate to release its charge, and hence, erase the data. The process of continually programming and erasing data (i.e., erase/reprogram cycles) causes cell fatigue, which, over time, negatively affects the memory's performance.

NAND flash memory comes in two forms: flash chips and final flash products. NAND flash chips can be combined with additional components, software or firmware to make final flash products that are eventually sold to consumers. NAND flash memory is incorporated into a variety of end-user products, including mobile phones, tablets, global positioning systems, portable and home gaming systems, and personal computers. Final flash products are a subset of these electronic products, and include solid state drives, memory cards, wireless memory, USB storage, embedded storage, and music and video players.

### B. DISPUTED PATENTS

SanDisk designs, develops, and manufactures data storage solutions using NAND flash memory. It holds a number of patents relating to flash memory technology, including the U.S. Patent Nos. 5,172,338 ("the '338 patent") and 5,991,517 ("the '517 patent"). The '338 patent and the '517 patent (collectively, "Disputed Patents") purport to improve the performance and accuracy of flash memory devices and systems. In this action, Plaintiffs allege that during the PTO's reexamination of the '338 patent, SanDisk misrepresented facts relating to claim 27 of the patent and withheld certain prior art references.[2] They also claim that SanDisk failed to disclose those references during the subsequent prosecution of the '517 patent. Those proceedings are discussed in greater detail below.

#### 1. The '338 Patent

##### a) Overview

The '338 patent, entitled "Multi-state EEprom Read and Write Circuits and

---

1. The Court, in its discretion, finds these matters suitable for resolution without oral argument. See Fed. R. Civ. P. 78(b); N.D. Cal. Civ. L.R. 7–1(b).

2. The prior art references consist of: U.S. Patent Nos. 4,890,259 ("'259 patent") and 4,989,179 ("'179 patent"), both of which were issued to Dr. Richard Simko (collectively, "Simko patents"); Japan Unexamined Patent

Application S62–188100 ("JP100 patent"); and Great Britain patent GB 2,029,145 ("GB145 patent"). The other allegedly withheld reference is a paper drafted in 1992 by SanDisk founders Sanjay Mehrotra ("Mehrotra") and Dr. Eli Harari ("Harari"), among others, for the Very Large Scale Integration Symposium in Seattle, Washington ("VLSI paper").

Techniques," was issued by the PTO on December 15, 1992. Chen Decl. Ex. 1 ('338 patent), at 1, Dkt. 314–1. The patent contains forty-seven claims and describes "[i]mprovements in the circuits and techniques for read, write and erase of EEprom memory [that] enable non-volatile multi-state memory to operate with enhanced performance over an extended period of time." '338 patent, Abstract. SanDisk founders Harari and Mehrotra, along with Winston Lee, are the named inventors of the patent, which was assigned to SanDisk. The '338 patent expired in December 2009.

At issue in this case is claim 27 of the '338 patent, which recites a "means for *inhibiting further programming* of correctly verified cells among the plurality of addressed cells." '338 patent, col. 26, lns. 28–54 (emphasis added). The purpose of this limitation is to address the issue of memory cell fatigue resulting from repeated erase/reprogram cycles. Id., col. 2,

Ins. 45–48. To accomplish such goal, the claim specifies that memory cells are programmed through a series of programming pulses, which are followed by verifying pulses to determine whether the target cells have reached their desired program states. Chen Decl. Ex. 6 at 2, Dkt. 314–6. Once the cell has reached its desired program state, additional programming of that cell is inhibited or terminated for the duration of the programming cycle. Id. When all cells reach the desired program states, the program cycle terminates. Id. at 3. This process is referred to as the "program terminate" technique. Id. By individually erasing only selected sectors of a cell array by inhibiting further programming of correctly verified cells, "over-erasing," and hence, cell fatigue, is reduced. Id. Ex. 7 at 149, Dkt. 314–7; '338 patent, col. 4, Ins. 14–16.

Figure 16 of the '338 patent depicts the circuitry that inhibits the further programming of the memory cells:

FIG—16.

In the circuit shown above, "721" depicts a latch that performs the function of inhibiting further programming to correctly verified cells. Generally, latches are referred to as "one-way" or "two-way" latches. A one-way latch only moves in one direction, whereas a two-way latch freely switches back and forth between two states when different values are applied. Chen Decl. Ex. 7 at 66. SanDisk claims that the latch

is a one-way latch, which provides the means for the permanent inhibit limitation. The function of latch 721—namely, whether the drawing of the latch teaches the use of a one-way or two-way latch—is disputed in this action.

### b) Reexamination

In January 1996, SanDisk filed a complaint with the United States International Trade Commission ("ITC"), alleging that Samsung's NAND flash memory products infringed, inter alia, claim 27 of the '338 patent. In the Matter of Certain Flash Memory Circuits and Products Containing Same, ITC No. 337–TA–382 ("the 382 Investigation").[3] During the pendency of the ensuing ITC investigation, SanDisk and Samsung submitted requests to the PTO to reexamine the '338 patent, which were granted on November 18, 1996. Chen Decl. Exs. 3, 4, 5, Dkt. 314–3, 314–4, 314–5. The reexamination requests were prompted by testimony in the 382 Investigation from Samsung's expert, Dr. Jonathan Allen, that claim 27 was anticipated in light of an article by Guido Torelli (a former employee of STMicroelectronics ("STM")), or alternatively, in combination with product brochures and technical notes for various STM integrated circuits. Id. Ex. 3 at 2.

The reexamination focused primarily on whether (1) claim 27 included a "permanent inhibit" claim limitation and (2) latch 721 was a one-way or two-way latch. The PTO was presented with materials from the 382 Investigation—including briefs, expert reports, witness testimony, proposed findings, the Administrative Law Judge's ("ALJ") Initial Determination, and the ITC's April 15, 1997 review order. Chen Decl. Ex. 12, Dkt. 314–12.[4]

On or about April 16, 1997, the PTO rejected Samsung's arguments and confirmed that "Claims 27, 32 and 44 are patentable over the prior art patents and publications[.]" Chen Decl. Ex. 14 (Reasons for Patentability/Confirmation in Reexamination No. 90/004387), Dkt. 314–14. The PTO found that the Torelli article does not disclose "an actual circuit for performing program verification" or a "means for inhibiting programming of correctly verified cells until all the plurality of addressed cells are verified correctly as recited in claim[ ] 27 ... of the '338 patent." Id. at 1. With respect to the STM product brochures and technical notes, the PTO found that they "fail to anticipate or render obvious the claims of the present invention alone or in combination with

---

**3.** Section 337(a)(1)(B) of the Tariff Act of 1930 prohibits the importation of articles that infringe upon a valid and enforceable United States patent. See 19 U.S.C. § 1337(a). A complaint brought under this provision is commonly referred to as a Section 337 action or proceeding. "[A] § 337 proceeding 'is not purely private litigation "between the parties" but rather is an "investigation" by the Government into unfair methods of competition or unfair acts in the importation of articles into the United States.' " Akzo N.V. v. U.S. Int'l Trade Comm'n, 808 F.2d 1471, 1488 (Fed. Cir. 1986) (citation omitted).

**4.** The assigned ALJ conducted a hearing in the 382 Investigation on SanDisk's complaint from September 25, 1996, until October 4, 1996. Chen Decl. Ex. 7 at 2. On February 26,

1997, the ALJ issued a lengthy Initial Determination in favor of SanDisk. The ALJ found claim 27 requires *"permanent inhibition* of further programming pulses to a cell that has been verified during the programming of a chunk of data." Id. at 93 (emphasis added). In reaching that conclusion, the ALJ agreed with SanDisk that latch 721 is a one-way latch, and that the inhibit means of claim 27 should be interpreted to include a one-way latch or its equivalent. While acknowledging co-inventor Mehrotra's testimony that one-way and two-way latches may be drawn in the same manner, the ALJ concluded that latch 721 must be a one-way switch, otherwise there would be a "catastrophic failure" of the device. Id. at 66, 68.

[the] Torelli reference and lack any structure for permanently inhibiting correctly verified cells for further programming." Id. at 2. Finally, the PTO concluded that "latch 721 in figure 16 ... is a one way resettable latch." Id. at 3.

## 2. The '517 Patent

The '517 patent, entitled "Flash EEprom System With Cell Programming Verification," incorporates the '338 patent by reference. Chen Decl. Ex. 2 ('517 patent), Dkt. 314–2. The patent discloses a "system of Flash EEprom memory chips with controlling circuits [that] serves as non-volatile memory such as that provided by magnetic disk drives." '517 patent, Abstract. This patent was intended, in part, to claim a permanent inhibit function without several of the claim limitations set forth in the '338 patent. Id. at 1. The PTO issued the '517 patent on November 23, 1999, containing thirty-nine claims. Id. Harari, Mehrotra and Robert D. Norman are the named co-inventors of the patent, which was assigned to SanDisk. The '517 patent expired in April 2009.

## C. Disputes with STM

Years after the '338 patent reexamination and the '517 patent prosecution concluded, SanDisk became embroiled in a series of patent disputes with STM, including a patent infringement action assigned to the Honorable Jeremy Fogel. During the pendency of that action, SanDisk initiated two Section 337 actions against STM in the ITC. Although STM is not a party to the instant action, Plaintiffs' opposition to SanDisk's summary judgment motion in the instant case relies heavily on one of Judge Fogel's rulings as well as decisions rendered in the ITC actions. For that reason, the Court summarizes those proceedings, as follows.

## 1. Lawsuit Against STM

On October 15, 2004, SanDisk sued STM in this Court, seeking declaratory judgment on fourteen STM patents and asserting the '338 patent against STM. SanDisk Corp. v. STMicroelectronics, Inc., et al., No. C 04–4379 JF ("STMicroelectronics"). On December 6, 2005, SanDisk filed a second lawsuit against STM, this time accusing it of infringing the '517 patent. SanDisk Corp. v. STMicroelectronics, Inc., et al., No. 05–05021 SBA.

On August 2, 2007, SanDisk consolidated the claims of both complaints, and filed a Second Amended Complaint in the earlier action. No. C 04–4379 JF, Dkt. 106. In response, STM filed Walker Process counterclaims against SanDisk. Id., Dkt. 109. STM alleged that SanDisk fraudulently secured the confirmation of the '338 patent by misrepresenting that latch 721 was a one-way latch and that claim 27 disclosed a permanent inhibit limitation. In addition, STM accused SanDisk of withholding material prior art (i.e., the Simko, GBM145 and JP100 patents and the VLSI article) from both the '338 patent reexamination and the prosecution of the '517 patent.

SanDisk moved for summary judgment on STM's counterclaims, which Judge Fogel granted in part and denied in part on October 17, 2008. Id., Dkt. 273 ("Fogel Order"). With regard to STM's Walker Process counterclaims, Judge Fogel found that there were questions of fact regarding SanDisk's intent to deceive the PTO and the materiality of the prior art references. Id. at 9–13. In rendering his decision, Judge Fogel relied on expert testimony presented by STM and the findings from the concurrent ITC investigations. Id. SanDisk and STM eventually reached a confidential settlement agreement and voluntarily dismissed the action in September 2009. Id., Dkt. 332.

## 2. The 526 Investigation

The same day that SanDisk filed suit against STM, SanDisk also submitted a Section 337 complaint with the ITC, asserting, inter alia, claim 27 of the '338 patent against STM's NAND products. In the Matter of NAND Flash Memory Circuits and Products Containing Same, Investigation No. 337–TA–526 ("526 Investigation").[5] In response, STM raised several defenses similar to those previously made by Samsung in the 382 Investigation, including that the patent was invalid in light of certain prior art references, and that SanDisk had engaged in inequitable conduct during the reexamination of the '338 patent. With regard to claim 27, STM argued that the claim should be construed such that "the 721 latch is a two-way latch, and therefore ... the '338 patent cannot disclose permanent inhibit, as argued by [SanDisk]." Chen Decl. Ex. 30 at 51, Dkt. 314–25.

In October 2005, the ALJ found that upon reviewing the language and figures presented in the patent, a person skilled in the art would understand that the function of "means for inhibiting" (in claim 27) "to be terminating or inhibiting further programming of verified cells for the remainder of the programming operation." Id. at 50. The ALJ further concluded that the structure for the claim element "means for inhibiting" is the one-way latch depicted in Figure 16. Id. at 51.

The ALJ also rejected STM's arguments that the '338 patent was invalid as anticipated in light of Simko's '259 patent, or obvious under the JP100 patent. Id. at 109–125. In addition, the ALJ found no merit to STM's claim that SanDisk had attempted to intentionally mislead the Examiner during the reexamination of the '338 patent by failing to disclose the VLSI paper prepared by SanDisk founders Mehrotra and Harari. Id. at 128–36; id. at 136 ("The ALJ finds no material facts that SanDisk presented to the Patent Office that were false nor does he find that SanDisk withheld material information."). Notwithstanding these findings, the ALJ ruled that STM's chips did not possess an equivalent structure that infringed upon the means for inhibiting limitation of the '338 patent. Id. at 102. The ITC affirmed the ALJ's decision, id. at 2, and the Federal Circuit affirmed without comment, Sandisk Corp. v. Int'l Trade Comm'n, 219 Fed.Appx. 984, 985 (Fed. Cir. 2007).

## 3. The 560 Investigation

Also during the pendency of the San-Disk–STM patent litigation, SanDisk filed a second Section 337 complaint against STM, asserting the '338 patent against its NOR products, and the '517 patent against its NAND and NOR products. Chen Reply Decl. Ex. L at 10–15, Dkt. 332–13. On June 1, 2007, the ALJ issued his Initial Determination. Id. With respect to the '338 patent, the ALJ declined to consider San-Disk's infringement claims on the ground that SanDisk lacked information to satisfy the domestic industry requirement, as specified in 19 U.S.C. § 1337(a)(2).[6]

Turning to the '517 patent, the ALJ found that STM's NAND products infringed all but three of the ten asserted claims. Id. at 142. However, the ALJ concluded that: (1) claims 1, 6 and 10 of the '517

---

**5.** Judge Fogel stayed the litigation as to the infringement claims based on the pendency of the 526 Investigation. No. C 04–4379 JF, Dkt. 32. The stay was lifted after the ITC proceedings relating to the 526 Investigation concluded on December 5, 2005.

**6.** In Section 337 actions before the ITC, the complainant must establish that a domestic industry for articles protected by the asserted patent(s) exists or is in the process of being established. 19 U.S.C. § 1337(a)(2).

patent were "invalid under 35 U.S.C. § 102 for anticipation based on the GB145 prior art reference," id.; (2) "claims 1, 3, 5, 6, 10, 12, 13 and 14 of the '517 patent are taught by JP100 in combination with [Simko's '179 patent]," id. at 130, and hence, were "invalid under 35 U.S.C. § 103 for obviousness," id. at 143; and (3) claims 1, 6 and 10 of the '517 patent were anticipated by the GB145 patent and obvious based on the JP100 patent, along with other prior art references. Id. at 141. In reaching these conclusions, the ALJ expressly relied on the opinions of Dr. Pashley, an expert retained by STM in connection with the 560 investigation. Id. at 116–17, 130, 134. SanDisk did not seek further review by the ITC, and the ALJ's Initial Decision therefore became final on July 13, 2007.

### D. Procedural History

On June 25, 2010, Ritz commenced the instant antitrust action, on behalf of itself and a putative class, alleging claims under § 2 of the Sherman Act against SanDisk and Harari (collectively, "Defendants").[7] Dkt. 1. CPM and ESE were joined as party-plaintiffs in the Third Amended Complaint. Dkt. 150. Mflash was joined as an additional party-plaintiff in the Fourth Amended Complaint ("4AC"), filed September 24, 2014, which is the operative pleading. Dkt. 244. The 4AC, in which

SanDisk is the only named Defendant, alleges two claims for monopolization and attempted monopolization under § 2 of the Sherman Act. Both claims are predicated on the same theories of anticompetitive conduct; i.e., Walker Process fraud, tortious conversion, customer threats, anticompetitive settlement, and refusal to deal.

The core of this case is Plaintiffs' Walker Process claim, which is predicated upon accusations that SanDisk made misrepresentations and withheld relevant prior art during the reexamination of the '338 patent, and omitted the same prior art during its prosecution of the '517 patent. 4AC ¶¶ 39–41, 45–49, 57, 62, 66, 68. More specifically, the pleadings aver that SanDisk misrepresented to the PTO Examiner that "claim 27 was patentable because the inhibit function was 'permanent' and not incremental or temporary, that this structure was latch 721 shown in Figure 16, and that a person of ordinary skill in the art would know that latch 721 operates as a 'one-way latch' required for a permanent inhibit." Id. ¶ 48. Plaintiffs also allege that SanDisk withheld prior art during reexamination. The undisclosed prior art is identified as: (1) the Simko patents; (2) the JP100 Patent; (3) the Sparks Patent; (4) the GB145 patent; and (5) the 1992 VLSI paper. Id. ¶¶ 56–77.[8] Plaintiffs do not allege that SanDisk made any misrepresentations in con-

---

**7.** "Private suits to enforce the Sherman Act are authorized by Section 4 of the Clayton Act, 15 U.S.C. § 15(a)...." Knevelbaard Dairies v. Kraft Foods, Inc., 232 F.3d 979, 987 (9th Cir. 2000).

**8.** The "Sparks patent" (U.S Patent No. 4,752,-871) is alleged in the pleadings as invalidating prior art, see 4AC ¶¶ 64–66, but is not discussed or mentioned in Plaintiffs' opposition to SanDisk's summary judgment motion. In view of that omission, the Court presumes that Plaintiffs have abandoned their claims insofar as they are premised on the nondisclosure of the Sparks patent. See Shakur v. Schriro, 514 F.3d 878, 892 (9th Cir. 2008)

("We have previously held that plaintiff has 'abandoned ... claims by not raising them in opposition to [the defendant's] motion for summary judgment.'") (quoting Jenkins v. Cnty. of Riverside, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005)); see also Indep. Towers of Wash. v. Wash., 350 F.3d 925, 929 (9th Cir. 2003) ("Our circuit has repeatedly admonished that we cannot 'manufacture arguments for an appellant' and therefore we will not consider any claims that were not actually argued in appellant's opening brief.") (quoting in part Greenwood v. Fed. Aviation Admin., 28 F.3d 971, 977 (9th Cir. 1994)).

nection with the '517 patent prosecution, but claims that SanDisk withheld the aforementioned prior art references.

On February 23, 2015, SanDisk filed a motion for summary judgment. Dkt. 274. On May 14, 2015, the Court granted Plaintiffs' motion for class certification in part, and denied it in part, and certified a class comprised of final flash products only. Dkt. 302 at 40. On June 22, 2015, the Court denied SanDisk's summary judgment motion without prejudice on the ground that class notice had not yet been disseminated. Dkt. 305. On October 16, 2015, SanDisk renewed its motion for summary judgment along with a motion to exclude Dr. Sullivan's opinions and testimony. Dkt. 312, 313. Briefing on the motions closed on November 25, 2015. Dkt. 331, 331.[9]

## II. LEGAL STANDARD

"[S]ummary judgment is appropriate where there 'is no genuine issue as to any material fact" and the moving party is "entitled to a judgment as a matter of law.'" Alabama v. North Carolina, 560 U.S. 330, 344, 130 S.Ct. 2295, 176 L.Ed.2d 1070 (2010) (quoting Fed. Rule Civ. Proc. 56(c)) (citing cases). "The burden of establishing the nonexistence of a 'genuine issue' is on the party moving for summary judgment." Celotex Corp. v. Catrett, 477 U.S. 317, 330, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the moving party meets that burden, the burden then shifts to the non-moving party to designate specific facts demonstrating the existence of a genuine issue of material fact. Id. at 324, 106 S.Ct. 2548. An issue is "genuine" only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 322–23, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). All reasonable inferences are to be drawn in favor of the party against whom summary judgment is sought. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Only admissible evidence may be considered. Orr v. Bank of Am., 285 F.3d 764, 773 (9th Cir. 2002).

## III. DISCUSSION

### A. WALKER PROCESS CLAIM

■ A Walker Process claim is grounded on the notion that "the enforcement of a patent procured by fraud on the Patent Office may be violative of [§ ] 2 of the Sherman Act provided the other elements necessary to a [§ ] 2 case are present." Walker Process Equip., Inc. v. Food Mach. & Chem. Corp., 382 U.S. 172, 174, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965). "In order to prevail on a Walker Process claim, the antitrust-plaintiff must show two things: first, that the antitrust-defendant obtained the patent by knowing and willful fraud on the patent office and maintained and enforced the patent with knowledge of the fraudulent procurement; and second, all the other elements necessary to establish a Sherman Act monopolization claim." TransWeb, LLC v. 3M Innovative Props. Co., 812 F.3d 1295, 1306 (Fed. Cir. 2016).

■ The party asserting a Walker Process claim, whether through a fraudulent misrepresentation or a fraudulent omission, must present evidence of "a clear intent to deceive the examiner and thereby cause the PTO to grant an invalid patent." Nobelpharma AB v. Implant Innovations,

---

9. Plaintiffs urge the Court to summarily deny SanDisk's renewed summary judgment motion on the ground that it "differs significantly from its original motion." Pls.' Opp'n to SanDisk Corp.'s Renewed Mot. for Summ. J. ("Opp'n") at 7 n.14. However, the Court's order denying SanDisk's original motion for summary judgment did not preclude SanDisk from changing its arguments.

Inc., 141 F.3d 1059, 1070 (Fed. Cir. 1998). Where a fraudulent omission is alleged, "there must be evidence of intent separable from the simple fact of the omission." Dippin' Dots, Inc. v. Mosey, 476 F.3d 1337, 1347 (Fed. Cir. 2007). In addition to intent, the plaintiff must demonstrate materiality; that is, "a clear showing of reliance, i.e., that the patent would not have issued but for the misrepresentation or omission." Nobelpharma, 141 F.3d at 1071. Materiality is generally established by showing that omitted or misrepresented prior art (or other relevant information) would have required the examiner to reject the application. Id. at 1072.

### B. EVIDENCE OF FRAUD

#### 1. Prior Testimony

Plaintiffs allege that SanDisk falsely represented to the PTO during the '338 reexamination that claim 27 was patentable because the "inhibit" function is "permanent," and that latch 721 (which is the means to perform the inhibit function) is a "one-way" latch. 4AC ¶¶ 48–50. According to Plaintiffs, SanDisk "knew full well that the latch 721 was a two-way latch, and . . . nonetheless *argued* the exact opposite to the PTO during the reexamination proceedings." Opp'n at 9 (emphasis added), Dkt. 322. In support of this claim, Plaintiffs cite various snippets of testimony by Mehrotra, co-inventor of the '338 patent, and Dr. Mohan Rao ("Rao"), an expert retained by SanDisk, from the 560 Investigation hearing. That testimony, Plaintiffs contend, proves that SanDisk's "own witnesses have conceded" that latch 721 was, in fact, intended to be a two-way latch. Opp'n at 10.[10]

Plaintiffs mischaracterize the testimony on which they rely. In the cited portions of the hearing transcript, Mehrotra acknowl-edged that the majority of latches drawn in the manner depicted in latch 721 are two-way latches, and that "if all you had to look at was [a drawing of] latch [721], you wouldn't know whether that latch is a one-way latch or a two-way latch . . . ." Hall Decl. Ex. D at 412:5–15, Dkt. 321–6. What Plaintiffs omit, however, is that Mehrotra also made it abundantly clear that, in the context of the '338 patent, latch 721 is intended to represent a one-way latch to perform the permanent inhibit function. He stated that whether latch 721 is a one-way or two-way latch cannot be ascertained based solely on how the latch is depicted graphically in Figure 16. Chen Reply Decl. Ex. F at 439:23–440:1, Dkt. 332–6. Mehrotra explained: "But as I've said before, that you really have to look at figure 15 in the context of figure 16 and the rest of the patent, which clearly teaches that programming is to be terminated permanently." Id. at 412:16–20. He emphasized that every latch is defined by the function it is intended to perform, and that such function cannot be determined exclusively from the graphical depiction of the latch in the patent. Id. at 439:23–440:1. Rather, "[t]he function that the latch has to perform is really determined by all the text in the patent that says programming needs to be terminated once a cell has achieved verify state." Id. at 440:2–5.

Likewise, Plaintiffs' assertion that Rao "conceded" that latch 721 is a two-way latch also is unsupported by the record. Opp'n at 10. During the 560 Investigation hearing, opposing counsel questioned Rao regarding whether the text at column 20, lines 25 to 32, of the '338 patent teaches a two-way switch. Hall Decl. Ex. E at 3020:10–3021:9, Dkt. 321–7. Rao acknowledged that it did. Id. at 3021:16–3022:5. But Plaintiffs ignore that Rao explained that it is improper to construe the '338

---

10. Dr. Rao has not been identified as an ex-pert in this action.

patent based on isolated language in the specification, and that upon construing the language of the patent as a whole, a person of ordinary skill in the art would understand that claim 27 teaches a one-way latch. Id. at 3028:10–3030:4 ("I also said that you have to put all of these together and read the whole specification, the figures, et cetera. If you only look at isolation, you may come to a different conclusion.... [¶] My conclusion was, when I put all those things together, it taught me that it is a one-way latch."); id. at 3160:25–3161:7 ("a person of ordinary skill in the art would have known how to design a one-way latch out of cross-coupled inverters ... based on the disclosure in the '338 patent").[11]

■ Importantly, the distinction drawn by Mehrotra and Rao between viewing the depiction of latch 721 in isolation versus viewing it in the context of the '338 patent as a whole is entirely consistent with the law governing claim construction. It is a fundamental tenet of claim construction that patent claims "must be read in view of the specification, of which they are a part." Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996); Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("the specification is always highly relevant to the claim construction analysis" and "is the single best guide to the meaning of a disputed term"); Pacing Techs., LLC v. Garmin Int'l, Inc., 778 F.3d 1021, 1024 (Fed. Cir. 2015) ("claim terms are construed in light of the specification and prosecution history, not in isolation.").

Claim terms must be interpreted as one skilled in the art would interpret them in light of the patent's claim, specification and prosecution history, "regardless of how those skilled in the art would interpret a term in other situations...." Vitronics, 90 F.3d at 1585. In view of these standards, the isolated and out-of-context remarks of Mehotra and Rao cited by Plaintiffs are insufficient to establish that SanDisk knowingly provided false information to the PTO.

■ Aside from the foregoing, the statements on which Plaintiffs rely are *arguments*, as opposed to factual representations, which, as a matter of law, cannot form the basis of a Walker Process fraud claim. See Nobelpharma, 141 F.3d at 1068 (noting that a Walker Process claimant must prove that the patentee "knowingly and willfully misrepresented *facts*" to the PTO) (emphasis added). The Federal Circuit has held that an argument advocating a particular interpretation of the teachings of a disclosure cannot be considered a material misrepresentation if the examiner could reach his own conclusions regarding the disclosure. See Life Techs., Inc. v. Clontech Labs., Inc., 224 F.3d 1320, 1326 (Fed. Cir. 2000) ("the inventors merely advocated a particular interpretation of the teachings of the Johnson article and the level of skill in the art, which the Examiner was free to accept or reject. This argument did not contain any factual assertions that could give rise to a finding of misrepresentation."); Akzo N.V. v. U.S. Int'l Trade Comm'n, 808 F.2d 1471, 1482 (Fed. Cir. 1986) ("The mere fact that Du Pont attempted to distinguish the Blades process from the prior art does not constitute

---

11. Plaintiffs also claim that the algorithm described in the '338 patent "requires latch 721 to be a 'two-way' latch" and that the '338 patent does not describe how latch 721 could function as a one-way latch. Opp'n at 10 and n.19, 20. Again, however, the cited testimony of Mehrotra and Rao from the 560 Investigation hearing does not support these contentions.

a material omission or misrepresentation. The examiner was free to reach his own conclusion regarding the Blades process based on the art in front of him."). Here, SanDisk merely argued to the PTO that one skilled in the art would understand latch 721, when construed in context with the language of the patent specification, to function as a one-way latch to facilitate a permanent inhibit limitation. Based on that argument, the Examiner was free to draw his own conclusion based on the record presented. That argument, as a matter of law, does not amount to a misrepresentation of fact.

## 2. VLSI Paper

Plaintiffs next argue that the VLSI paper drafted by Mehrotra and Harari in 1992 "confirms that latch 721 was intended to represent a two-way latch," and shows that SanDisk lied to the PTO during the reexamination of the '338 patent. Opp'n at 10; see 4AC ¶ 72. To support this assertion, Plaintiffs cite the following snippet of Rao's testimony from the 560 Investigation hearing:

Q Now, this article, the VLSI article, it has a reset transistor to the left of the cross-coupled converters, right?

A Yes, the figure shows it.

Hall Decl. Ex. E at 3049:24–3050:2. This question and answer clearly does not support the assertion that the VLSI paper depicts a two-way latch or that such latch is drawn identically to latch 721, as depicted in the '338 patent—let alone that San-Disk intended to defraud the PTO.

In any event, whether the depiction of the latch shown in the VLSI paper is the same as latch 721 in the '338 patent is inapposite. The Examiner was presented with all the information from the 382 Investigation, including Samsung's evidence and argument as to why latch 721 should be construed as a two-way latch—and not

a one-way latch as advocated by SanDisk. Chen Decl. Ex. 12. The PTO is presumed to have reviewed the information presented. See American Hoist & Derrick Co. v. Sowa & Sons, Inc., 725 F.2d 1350, 1359 (Fed. Cir. 1984) (noting that a PTO examiner is presumed to have considered the documents submitted); Fiskars, Inc. v. Hunt Mfg. Co., 221 F.3d 1318, 1327 (Fed. Cir. 2000) ("An applicant cannot be guilty of inequitable conduct if the reference was cited to the examiner, whether or not it was a ground of rejection by the examiner"). After considering this information, along with the extensive evidence and arguments submitted by the parties, the Examiner nonetheless determined that latch 721 was a one-way latch. Notably, the Examiner specifically noted Mehrotra's admission is a two-way latch is drawn the exact same way as latch 721 in Figure 16. Chen Decl. Ex. 10 at 62, Dkt. 314–10; id. Ex. 7 at 66.

In sum, the Court finds that SanDisk's failure to disclose the VLSI paper does not support the conclusion that SanDisk misrepresented information to the PTO. Plaintiffs also have failed to demonstrate that the non-disclosure of the paper in any way affected the PTO's decisions regarding the Disputed Patents.

## 3. Prior Art References

Finally, Plaintiffs accuse SanDisk of deliberately withholding prior art references (i.e., the Simko, GB145 and the JP100 patents) during the reexamination of the '338 patent and prosecution of the '517 patent. Opp'n at 4–5, 11. With regard to the Simko and GB145 patents, Mehrotra and Rao acknowledged (during the course of the 560 Investigation hearing) that those prior art references disclosed a "permanent inhibit" limitation. Hall Decl. Ex. D at 480:6–18; id. Ex. E at 3000:4–8, 3014:16–18. Plaintiffs argue that such testimony proves that SanDisk knew the "permanent inhi-

bit" feature was not novel, and that the disclosure of these prior art references to the PTO would have resulted in its rejection of the Disputed Patents. 4AC ¶¶ 58, 62, 69.

As for the JP100 patent, Plaintiffs allege that SanDisk knew that the PTO's awareness of that reference would have invalidated the '517 patent. Plaintiffs point to a decision by the patent office in Japan in 2001 which cited the JP100 patent in the course of rejecting the Japanese "counterpart" to the '517 patent. Opp'n at 5.[12] They also cite to the ALJ's finding in the 560 Investigation that the '517 patent was anticipated and/or obvious in light of the JP100 patent, as well as the Simko and GB145 patents. Id. Plaintiffs further assert that "[h]ad SanDisk disclosed the JP100 patent, the claim of the '517 patent would not have issued as written." 4AC ¶ 63.

#### a) Materiality

Where a Walker Process claim is based on the omission of prior art, the plaintiff must show both materiality and fraudulent intent. Nobelpharma, 141 F.3d at 1070–71. "To establish materiality, it must be shown that the PTO would not have allowed the claim *but for* the nondisclosure or misrepresentation." In re Rosuvastatin Calcium Patent Litig., 703 F.3d 511, 519 (Fed. Cir. 2012) (emphasis added). "[P]rior art is butfor material if the PTO would not have allowed a claim had it been aware of the undisclosed prior art." Therasense, Inc. v. Becton, Dickinson & Co., 649 F.3d 1276, 1291 (Fed. Cir. 2011). Materiality must be shown by clear and convincing evidence. Id. at 1290–91.

Plaintiffs assert that the Simko, GB145 and the JP100 patents teach a "per-manent inhibit" limitation, and that had those prior art references been presented to the PTO, it would have concluded that the permanent inhibit limitation disclosed in the Disputed Patents was not novel. Opp'n at 4; 4AC ¶¶ 56–58, 59–63, 67–69. Novelty is, of course, a prerequisite to obtaining a patent. 35 U.S.C. § 102. "Invalidity based upon lack of novelty (often called 'anticipation') requires that the same invention, including each element and limitation of the claims, was known or used by others before it was invented by the patentee." Oney v. Ratliff, 182 F.3d 893, 895 (Fed. Cir. 1999). "Anticipation under § 102 requires 'the presence in a single prior art disclosure of all elements of a claimed invention arranged as in that claim.'" Sandt Tech., Ltd. v. Resco Metal & Plastics Corp., 264 F.3d 1344, 1350 (Fed. Cir. 2001) (citations omitted). A patent claim is invalid as obvious if the differences between the claims and the prior art are such that "the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art." 35 U.S.C. § 103(a); Graham v. John Deere, 383 U.S. 1, 17–18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966) (setting forth test for obviousness).

The Federal Circuit has instructed that a validity analysis must be performed on a "claim-by-claim" basis. Amazon.com, Inc. v. Barnesandnoble.com, Inc., 239 F.3d 1343, 1351 (Fed. Cir. 2001). To that end, the district court must first construe the disputed claims to determine their meaning, and then analyze the asserted prior art references against the construed claims. Id. Where, as here, complex technology is involved, a validity analysis must be supported by expert testimony.

---

**12.** This particular assertion is uncompelling. Medtronic, Inc. v. Daig Corp., 789 F.2d 903, 907–908 (Fed. Cir. 1986) (a validity determination made by another country is irrelevant to whether a patent is valid under United States patent law due to the varying standards of patentability).

Proveris Scientific Corp. v. Innovasystems, Inc., 536 F.3d 1256, 1267 (Fed. Cir. 2008) (holding that expert testimony was required to establish invalidity on grounds of anticipation and obviousness where the subject matter is sufficiently complex to fall beyond the grasp of an ordinary layperson); see also Wyers v. Master Lock Co., 616 F.3d 1231, 1240 n.5 (Fed. Cir. 2010) ("[E]xpert testimony may be critical, for example, to establish the existence of certain features in the prior art."). To properly demonstrate invalidity, the expert must "quote[ ] the particular portions of the references that [a]re relevant for each of the claim limitations" and "for each claim limitation, . . . connect[ ] it with disclosures in the prior art that he believe[s] taught each particular limitation." Med. Instrumentation & Diagnostics Corp. v. Elekta AB, 344 F.3d 1205, 1220 (Fed. Cir. 2003).

 Here, Plaintiffs make no effort to construe any claims of the Disputed Patents. Nor do they provide any explanation or analysis of the prior art references from which the Court may ascertain whether they would have materially affected the PTO's conclusions regarding the patentability of the Disputed Patents had they been disclosed. See Xerox Corp. v. 3Com Corp., 458 F.3d 1310 1322 (Fed. Cir. 2006) (noting that to demonstrate anticipation, the proponent must show "that the four corners of a single, prior art document describe every element of the claimed invention."); see also Motorola Mobility, LLC v. Int'l Trade Comm'n, 737 F.3d 1345, 1350 (Fed. Cir. 2013) ("Motorola's obviousness argument fares no better. For starters, Motorola did not clearly identify the scope and content of the prior art that it was asserting, or provide any argument that certain prior art references render a specific claim obvious."). The mere fact that aforementioned prior art references

apparently included a program inhibit feature, without more, is plainly insufficient to show that the PTO would have deemed the Disputed Patents invalid had those references been disclosed. See Biotec Biologische Naturverpackungen v. Biorcorp, Inc., 249 F.3d 1341, 1353 (Fed. Cir. 2001) ("It is well established that conclusory statements of counsel or a witness that a patent is invalid do not raise a genuine issue of fact.").

The lack of any supporting expert testimony also forecloses Plaintiffs' ability to establish that the PTO's awareness of the aforementioned prior art references would have led to the rejection of the Disputed Patents. Plaintiffs maintain that this case does not involve "complicated issues of technology" and the "record evidence is more than sufficient" to allow a reasonable juror to conclude that SanDisk knew the depiction of latch 721 in the '338 patent was intended to be a two-way latch, but "nonetheless represented to the PTO that it had intended the latch to be a one-way latch." Opp'n at 12, 13. It is true that "expert testimony is not required when the references and the invention are easily understandable." Wyers, 616 F.3d at 1242 (holding that expert testimony was unnecessary to assess obviousness of patent for pin locks used to secure trailers to cars and sport utility vehicles). However, Plaintiffs' suggestion that the issues in this case are within the grasp of a layperson strains credulity.

The Disputed Patents relate to EEprom circuitry, which itself is highly technical and complex. The basic function of an EEprom circuit is explained in the '338 patent as follows:

> An Eprom utilizes a floating (unconnected) conductive gate, in a field effect transistor structure, positioned over but insulated from a channel region in a semiconductor substrate, between

source and drain regions. A control gate is then provided over the floating gate, but also insulated therefrom. The threshold voltage characteristic of the transistor is controlled by the amount of charge that retained on the floating gate. That is, the minimum amount of voltage (threshold) that must be applied to the control gate before the transistor is turned "on" to permit conduction between its source and drain regions is controlled by the level of charge on the floating gate.

. . . .

An . . . EEprom . . . has a similar structure but additionally provides a mechanism for removing charge from its floating gate upon application of proper voltages.

'338 patent, col. 1, Ins. 17–24, 46–49. Against this backdrop, claim 27 recites the use of an array of EEprom cells on an integrated circuit chip "receptive to specific voltage conditions for reading, programming and erasing of data in the cell, and having a floating gate capable of retaining a specific charge level corresponding to a specific memory state of the cell, such that a specific memory state is achieved by increment or decrement of the charge level with successive applications of programming or erasing voltage conditions. . . ." Id. col. 1, Ins. 32–39. In turn, claim 27 recites various means-plus-function elements, including: (1) a "means for inhibiting further programming of correctly verified cells among the plurality of addressed cells" and (2) a "means further programming and verifying in parallel the plurality of addressed cells and inhibiting programming of correctly verified cells until all the

plurality of addressed cells are verified correctly." Id., col. 26, Ins. 28–54.

It is plain from the foregoing summary that the technology underlying the Disputed Patents is not easily understandable and is beyond the comprehension of an ordinary layperson. The Court therefore finds, as an alternative matter, that the absence of expert testimony to support Plaintiffs' arguments is fatal to their claims. E.g., Alexsam, Inc. v. IDT Corp., 715 F.3d 1336, 1348 (Fed. Cir. 2013) ("In this case, the technology was complex and the prior-art references were not easily understandable without expert testimony. . . . Expert testimony was required not only to explain what the prior-art references disclosed, but also to show that a person skilled in the art would have been motivated to combine them in order to achieve the claimed invention. IDT provided no such expert testimony.").[13]

In an apparent attempt to overcome the dearth of admissible evidence to support a finding of materiality, Plaintiffs direct the Court's attention to Judge Fogel's summary judgment ruling in the STMicroelectronics action. Opp'n at 8. According to Plaintiffs, Judge Fogel considered the "same record evidence" presented in the instant action, and ruled that there was sufficient evidence for a jury to find that the PTO would not have issued the '517 patent but for SanDisk's failure to disclose one of the Simko patents, as well as the GB145 and the JP100 patents. Id. at 9. In reaching that decision, Judge Fogel relied on the ALJ's findings to that effect in the 560 Investigation and expert testimony. As to the '338 patent, Judge Fogel was persuaded by STM's contention that San-

---

**13.** Plaintiffs offer the opinions of Dr. Sullivan to establish the elements of an antitrust violation, e.g., market power or dangerous probability of market power, antitrust injury, causation and damages. Dr. Sullivan does not offer—nor does he appear qualified to offer—any opinions regarding the complicated technology underlying the Disputed Patents or the prior art references.

Disk's failure to disclose the Simko and GB145 patents during the reexamination process materially affected the PTO's decision to confirm that patent.

■ Plaintiffs' reliance on Judge Fogel's order is wholly misplaced. First, neither his ruling nor any of the findings therein is *evidence* for purposes of summary judgment in *this* action. Although the Court may take judicial notice of Judge Fogel's decision, such notice is "only for the limited purpose of recognizing the 'judicial act' that the order represents on the subject matter of the litigation." United States v. Jones, 29 F.3d 1549, 1553 (11th Cir. 1994); accord General Elec. Cap. Corp. v. Lease Resolution Corp., 128 F.3d 1074, 1082, n.6 (7th Cir. 1997) ("We agree that courts generally cannot take notice of findings of fact from other proceedings for the truth [of the matter] asserted therein because these findings are disputable and usually are disputed"). Accordingly, his ruling has no evidentiary value. See Berrios–Romero v. Estado Libre Asociado de Puerto Rico, 641 F.3d 24, 27 (1st Cir. 2011) ("[E]ven when a copy of a judicial decision is placed in the record, it is not 'evidence' nor is it fact."); see also Orr, 285 F.3d at 773 ("A trial court can only consider admissible evidence in ruling on a motion for summary judgment.").

■ Second, the Court is unpersuaded by Judge Fogel's analysis insofar as it is based on the ALJ's Initial Determination in the 560 Investigation. The 560 Investigation grew out of the Section 337 action brought by SanDisk against STM. In such an action, the ALJ's findings of fact and conclusions of law are based on—and limited to—the evidentiary record presented in the course of the ITC's investigation. See 19 U.S.C. § 1337(c) ("the Commission shall determine, *with respect to each investigation conducted by it under this section,* whether or not there is a violation of this

section") (emphasis added). As such, "decisions of the ITC involving patent issues have no preclusive effect in other forums...." Texas Instrs. Inc. v. Cypress Semiconductor Corp., 90 F.3d 1558, 1569 (Fed. Cir. 1996). Although Judge Fogel could have judicially noticed the fact that the ALJ made a finding with regard to the import of certain prior art, that finding is not admissible evidence for purposes of evaluating whether the party opposing summary judgment has submitted sufficient evidence to demonstrate the existence of a genuine dispute of material fact. See General Elec. Cap., 128 F.3d at 1082 n.6.

■ Third, Judge Fogel's ruling and the ALJ's Initial Determination in the 560 Investigation are inapposite because they are based on an evidentiary record that differs from the one before this Court. It is axiomatic that a summary judgment motion must be decided on the evidentiary record presented, not on evidence presented in other proceedings. Cf. Lippi v. City Bank, 955 F.2d 599, 604 (9th Cir. 1992) ("Our review is limited to the record presented to the district court at the time of summary judgment."). Judge Fogel's conclusions regarding the materiality of the disputed prior art references were largely predicated on submissions from STM's experts, Dr. Pashley and David Pricer. See Chen Reply Decl. Ex. C ¶ 15, Ex. D at 1–3. Likewise, the ALJ's findings that certain claims of the '517 patent were anticipated and/or obvious were based specifically on the testimony of Dr. Pashley, STM's retained expert in that investigation. Chen Reply Decl. Ex. L at 116, 126,·133–34, Dkt. 332–13. Neither of those experts has been disclosed nor retained by Plaintiffs in this action, and neither has submitted declarations in this case.

Finally, Plaintiffs argue that SanDisk previously admitted the materiality of the

Simko patents in a prior patent prosecution. Opp'n at 4, 11. In particular, Plaintiffs cite two pages from the patent history file for U.S. Patent No. 5,293,560 ("'560 patent"), which relates to a patent application submitted to the PTO by Harari in 1993, and approved in 1994. Opp'n at 4–5. In particular, Plaintiffs seize upon a comment (in response to objections in the Examiner's Action) made by attorney Gerald Parsons of the law firm Majestic, Parsons, Siebert & Hsue, that "[c]laim 9 of patent no. 4,890,259 and claims 1–4 and 9–12 of the 4,989,179 *are of particular interest* to the disclosure and claims of this and the parent applications." Hall Decl. Ex. H at ST–H 0000016485, 87–88, Dkt. 321–10 (emphasis added). The cited evidence, however, does not demonstrate that SanDisk has conceded that the Simko patents are material prior art references with respect to either of the Disputed Patents. There is no evidence presented that the '560 patent contains claim limitations that have any relation to claims at issue in the Disputed Patents. Nor do Plaintiffs provide any explanation as to how counsel's remark—that certain of the claims in the Simko patents are "of particular interest" to the claims of the '560 patent—necessarily means, by extension, that the Simko patents are material to the Disputed Patents.

The Court finds that Plaintiffs have failed to raise a genuine issue of material fact as to the issue of materiality. No admissible evidence has been presented to show either that the '338 patent would not have been confirmed or the '517 patent would not have been issued by the PTO had SanDisk disclosed the prior art references to the PTO.

#### b) *Intent to Deceive*

■ Irrespective of Plaintiffs' showing of materiality, the record does not support the conclusion that SanDisk intended to deceive the PTO. "[A] finding of Walker Process fraud ... must be based on independent and clear evidence of deceptive intent." Nobelpharma, 141 F.3d at 1070. " 'In a case involving nondisclosure of information, clear and convincing evidence must show that the applicant made a deliberate decision to withhold a known material reference.' ... In other words, the accused infringer must prove by clear and convincing evidence that the applicant knew of the reference, knew that it was material, and made a deliberate decision to withhold it." Therasense, 649 F.3d at 1290 (citation omitted). "A mere failure to cite a reference to the PTO will not suffice." Nobelpharma, 141 F.3d at 1071.

Plaintiffs do not offer any evidence of deceptive intent, but instead, again rely on Judge Fogel's determination in the STMicroelectronics action that there was a question of fact as to whether SanDisk intended to deceive the PTO in relation to the reexamination of the '338 patent and prosecution of the '517 patent. Opp'n at 14 (citing Fogel Order at 12). That ruling cited five instances of "circumstantial evidence" from which a jury ostensibly could infer fraudulent intent: (1) SanDisk's outside counsel had access to the undisclosed prior art in a computerized index used for SanDisk's patent prosecutions; (2) SanDisk's counsel cited the Simko patents as relevant prior art in a previous patent application (i.e., the '560 patent); (3) SanDisk had retained Simko as a consultant in connection with the '338 patent reexamination; (4) the JP100 patent was in the searchable prior art database and SanDisk's counsel "made arguably conflicting statements regarding his familiarity with that reference"; and (5) SanDisk potentially made inaccurate statements during the '338 patent reexamination.

■ As discussed above, another court's ruling is not evidence and is insufficient to sustain Plaintiffs' burden of dem-

onstrating a triable issue of fact. That aside, the "circumstantial evidence" cited in Judge Fogel's order is uncompelling or otherwise not part of the record in this case. As a threshold matter, the fact that the Simko and JP100 patents were accessible to SanDisk's outside law firm in a prior art index used for SanDisk patent prosecutions proves nothing. Even assuming arguendo that access means possession, the mere "possession" of prior art does not imply any knowledge of the materiality of that art. Nordberg, Inc. v. Telsmith, Inc., 82 F.3d 394, 396–97 (Fed. Cir. 1996) (holding that the mere presence of an undisclosed prior art reference contained in the patentee's files did not support a claim of intentional deception for purposes of inequitable conduct). In addition, that SanDisk's counsel might have been aware of the prior art does not trigger a disclosure obligation, even if they reasonably should have been aware of the prior art in connection with the '338 patent reexamination or '517 patent prosecution. Am. Hoist & Derrick Co. v. Sowa & Sons, Inc., 725 F.2d 1350, 1362 (Fed. Cir. 1984).

The Court also disagrees that SanDisk's counsel's reference to the Simko patents in connection with a prior prosecution of the '560 patent or Simko's professional relationship with SanDisk is probative of fraudulent intent. As noted, SanDisk's counsel cited the Simko patents as being of "particular interest" in the course of the '560 patent prosecution. However, Plaintiffs fail to explain the import of counsel's remark or the relationship, if any, between the '560 patent and the '338 patent. Simply because counsel considered the Simko patents relevant in a prior, unrelated patent prosecution does not suggest that he knew those patents were material to the '338 patent. See Exergen Corp. v. Wal–Mart Stores, Inc., 575 F.3d 1312, 1331 (Fed. Cir. 2009) ("The mere fact that an applicant disclosed a reference during prosecution of one application, but did not disclose it during prosecution of a related application, is insufficient to meet the threshold level of deceptive intent required to support an allegation of inequitable conduct."); C.R. Bard, Inc. v. M3 Sys., Inc., 157 F.3d 1340, 1365 (Fed. Cir. 1998) ("Deceptive intent is not inferred simply because information was in existence that was not presented to the examiner; and indeed, it is notable that in the usual course of patent prosecution many choices are made, recognizing the complexity of inventions, the virtually unlimited sources of information, and the burdens of patent examination."); Fuji Photo Film Co. v. Jazz Photo Corp. Inc., 173 F.Supp.2d 268, 276 (D.N.J. 2001) (finding that even if the undisclosed prior art references were material, the court could not infer an "intent [to deceive] solely from an inference derived from citations used in some patent prosecutions, but not other patent prosecutions."). As for Simko's consultancy with SanDisk, Plaintiffs' position is, in essence, that a trier of fact may reasonably infer that SanDisk knew the Simko patents were material to the Disputed Patents solely by virtue of its contacts with Simko. However, there is no evidence that Simko ever informed anyone involved in the '338 reexamination or the '517 prosecution during the relevant time-frame that his patents could be material.

Finally, the Court is unpersuaded by Plaintiffs' reference to Judge Fogel's remarks concerning the purported inconsistencies in representations made by SanDisk. With regard to his finding that "SanDisk's patent counsel has made arguably conflicting statements" regarding the program inhibit limitation during the '338 patent reexamination, Judge Fogel relied on "multiple deposition excerpts" submitted by STM in opposition to SanDisk's summary judgment motion. Fogel Order

at 3. Since no such deposition testimony has been proffered by Plaintiffs in this case, the Court is unable to independently evaluate whether the underlying statements attributed to SanDisk are, in fact, "conflicting" and probative of deceptive intent. With regard to the finding that SanDisk's counsel made conflicting statements regarding his familiarity with the JP100, there is no indication in Judge Fogel's summary judgment order what evidence he was relying upon. Nonetheless, Plaintiffs have cited to no evidence in the record to support such a finding in this case. The Court concludes that "independent and clear evidence of deceptive intent" on the part of SanDisk is wholly lacking in this case. Nobelpharma, 141 F.3d at 1070.[14]

### C. NON-WALKER PROCESS CLAIMS

SanDisk contends, and Plaintiffs do not dispute, that "each of [their] claims is dependent upon the theory that [SanDisk has] engaged in the enforcement of fraudulently-obtained patents." Def's Mot. at 3 (citing Order Granting in Part and Denying in Part Defs.' Mot. to Dismiss at 4, Dkt. 60). Since Plaintiffs' Walker Process claim fails, so too must Plaintiff's remaining theories of antitrust liability. Alternatively, Plaintiffs' failure to address their non-Walker Process claims is grounds for summary judgment on those theories. See Shakur, 514 F.3d at 892.

### IV. CONCLUSION

For the reasons stated above,

IT IS HEREBY ORDERED THAT:

1. SanDisk's Renewed Motion for Summary Judgment is GRANTED.

2. SanDisk's Motion to Exclude Opinions and Testimony of Dr. Ryan Sullivan is DENIED as moot.

3. The Clerk shall close the file and terminate all pending matters.

4. Judgment is entered in favor of SanDisk.

IT IS SO ORDERED.

---

14. Because it is clear that Plaintiffs cannot establish that SanDisk obtained the Disputed Patents by knowing and willful fraud on the PTO and maintained and enforced the patents with knowledge of the fraudulent procurement, the Court need not reach SanDisk's arguments that Plaintiffs also have failed to establish "all the other elements necessary to establish a Sherman Act monopolization claim." TransWeb, 812 F.3d at 1306.